**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ESSAM SAAD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:25-cv-11357** |
| | ) | |
| **BAKKT HOLDINGS, INC., BAKKT CRYPTO SOLUTIONS, LLC, BAKKT MARKETPLACE, LLC, and WEBULL PAY, LLC,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Essam Saad is a cryptocurrency investor. In 2022, Mr. Saad purchased approximately $250,000 in two cryptocurrencies on a digital platform operated by Defendants Bakkt Holdings, Bakkt Crypto Solutions, Bakkt Marketplace, and Webull Pay. In 2023, Defendants notified Mr. Saad that they would be liquidating his holdings in certain cryptocurrency "coins" that Defendants decided they would no longer support on their platform. Mr. Saad did nothing, his holdings were sold, and he was given most of the proceeds from the sale. Months later, the price of those cryptocurrencies soared. This lawsuit resulted: Mr. Saad alleges that Defendants conducted an unauthorized sale of his holdings for self-serving reasons, causing him the loss of the potential gains. He claims this violates the federal Commodity Exchange Act and state contract and tort law.[1] Defendants have moved to dismiss. As explained below, this motion is granted in part and denied in part.

---

[1] Federal jurisdiction does not depend on the federal commodities fraud claim; because Plaintiff is a citizen of Florida (FAC [5] at 3), and no Defendant is a citizen of Florida (*id.* at 3–4; Status Report [44]), the court has diversity jurisdiction over this case. *See* 28 U.S.C. § 1332(a)(1).

## BACKGROUND

The facts laid out below are taken from Saad's First Amended Complaint ("FAC") [5], which the court must accept as true at the pleading stage. *See Approved Mortg. Corp. v. Truist Bank,* 106 F.4th 582, 588 (7th Cir. 2024).

This case concerns an allegedly wrongful sale of cryptocurrency. A unit of cryptocurrency is a digital asset. Cryptocurrencies are not files on a user's computer—instead, ownership is tracked via a technology referred to as a "blockchain." (FAC [5] at 7.) The blockchain is a permanent ledger of cryptocurrency transactions that is maintained by a decentralized network of computers around the world; all cryptocurrency transactions are recorded in the blockchain, and once recorded, the blockchain cannot be meaningfully altered by any single person or entity. *See Coinbase, Inc. v. Sec. & Exch. Comm'n*, 126 F.4th 175, 182–83 (3d Cir. 2025) ("The core innovation of a blockchain network is decentralization. In a mature blockchain network, verifying transactions, issuing coins, and using tokens do not require oversight by a central authority or participation by human intermediaries."). Ownership over cryptocurrency is conferred by an entry in the blockchain ledger showing a particular amount of cryptocurrency at a particular address. *See generally id.* (describing blockchain). The user controls cryptocurrency via the use of a private key, which is a password that allows the user to buy, sell, transfer, exchange—in short, engage in any financial transaction with that cryptocurrency. These keys are typically stored via a computer program known as a cryptocurrency wallet. (FAC [5] at 7–8.)

The cryptocurrency platform at issue in this case is operated as part of a joint venture between Defendant Webull Pay, LLC, and various entities controlled by Defendant Bakkt Holdings, Inc. (*Id.* at 6–7.) The complaint is light on detail concerning the relationship among these entities; as the court understands things, Webull operates a mobile app "through which Plaintiff accessed cryptocurrency services" (*id.* at 7), but those specific services are provided by Defendants Bakkt Crypto and Bakkt Marketplace (*id.*; *see* Pl. Ex. 3 [5-3] at 1–2). Like many other cryptocurrency platforms, Defendants do not have an individual wallet for each accountholder:

Instead, they maintain a single, omnibus wallet where they hold all cryptocurrency on behalf of all accountholders and keep track of each user's balance separately. (FAC [5] at 8.) All users who have an account with Defendants must sign the Bakkt User Agreement. A copy of this agreement is attached to the FAC [5-1]; it states that cryptocurrencies in the omnibus wallet are "custodial assets held by Bakkt for [the user's] benefit." (User Agreement [5-1] at 13.) It also places the onus on the user to initiate all transactions (and bear the risk thereof):

> You understand and acknowledge that your Account is self-directed, you are solely responsible for any and all Orders placed through your Account, and all Orders entered by you are unsolicited and based on your own investment decisions. You understand and acknowledge that you have not received and do not expect to receive any investment advice from Bakkt Crypto or any of its affiliates in connection with your Orders.

(User Agreement [5-1] § 11.2.) The agreement also allows Defendants to "delist a cryptocurrency, at any time and for any reason at [Defendants'] sole discretion, including due to changes in a given cryptocurrency's characteristics after Bakkt Crypto has listed the cryptocurrency or due to a change in the cryptocurrency's regulatory classification." (*Id.* § 8.2.) The precise meaning of the word "delist," as well as what it means for a platform to "delist" a cryptocurrency, is the primary dispute of the case.

On approximately April 21, 2021, Mr. Saad, a citizen of Florida, opened an account with Defendants "for the purpose of investing in cryptocurrencies." (FAC [5] at 8.) Between January 22, 2022, and February 24, 2022, he purchased roughly 265,415.94 of the Cardano ("ADA") coin and 121.13 of the Solana ("SOL") coin. (*Id.* at 9.) At the time, this corresponded to a rough value of $235,471.93 and $9,567.20, respectively. (*Id.*) The transactions were executed through Defendants' cryptocurrency platform, with "custody" of the coins provided by Apex Crypto, LLC, a company that was later acquired by Bakkt. (*Id.* at 7, 9.) For roughly two years, Defendants held Mr. Saad's holdings in their cryptocurrency wallet without issue. (*See id.* at 9.)

On April 1, 2023, Bakkt acquired Apex Crypto and renamed it Bakkt Crypto Solutions, LLC. (*Id.*) Saad alleges that, following this acquisition, Defendants decided to revamp the

platform and remove a variety of cryptocurrencies from sale—including ADA and SOL. (*Id.*) He alleges, further, that after this acquisition, Defendants undertook a broad-scale "delisting" of dozens of cryptocurrencies, including ADA and SOL, citing alleged regulatory uncertainty. (*Id.*) Whether or when Defendants notified investors of the "delisting" or the reasons for it is not clear from the complaint. (*See id.*) A few months later, however, on September 8, 2023, Defendants notified customers via email that ADA would no longer be supported and that if they did not liquidate their holdings by September 19, 2023, Defendants would liquidate customers' holdings on their behalf and send the proceeds back to the user. (Delisting Emails [5-5] at 1; FAC [5] at 9.) On September 13, 2023, Defendants similarly emailed customers that SOL would no longer be supported, and that if they did not sell their assets before September 19, 2023, Defendants would liquidate their holdings and send the proceeds to the user. (Delisting Emails [5-5] at 2.) The language of these emails is materially identical; with respect to ADA, it reads as follows:

> Dear Valued Client,
>
> Supported tokens on the Webull platform are regularly reviewed by our cryptocurrency service provider, Bakkt (formerly known as Apex Crypto). Based on these periodic reviews, Bakkt may choose to modify or eliminate the support of particular digital assets. As a result of a recent review, Bakkt will no longer support Cardano (ADA).
>
> Any position in Cardano (ADA) that is not liquidated before September 19th at 5:30 PM EST will be fully liquidated by Bakkt. The proceeds will be distributed to customers' linked funding accounts.
>
> If you have any questions or concerns, please feel free to reach out to us through our in-app help center.
>
> Sincerely,
> The Webull Team

(Delisting Emails [5-5] at 1.) Saad did not respond to this email; the complaint does not explain why.

On September 21, 2023, without receiving Saad's consent (FAC [5] at 9), Defendants "unilaterally created and executed market sell orders liquidating 265,415.93 ADA and 121.13 SOL

from Plaintiff's account."[2] (*Id.* at 9–10.) Defendants sold Saad's cryptocurrencies at "below-market value to their own affiliate," Defendant Bakkt Crypto Solutions, LLC, and returned the proceeds to the customer. (*Id.* at 9.) Bakkt Crypto Solutions then resold the cryptocurrency (the date of this resale is not alleged), earning additional profit that was evidently not returned to Plaintiff. (*Id.*) Defendants contend this sale comported with the language of Bakkt's User Agreement that gives Defendants the right to "delist" any particular cryptocurrency; Saad disagrees, arguing that "delisting" is simply removing the ability to transact in a particular cryptocurrency—not forcing the sale of his cryptocurrency. (*See id.* at 18–19.)

Saad further alleges a nefarious rationale behind Defendants' actions: that the company forced the sale of cryptocurrency to "bolster liquidity at consumers' expense." (*Id.* at 10.) He points to Bakkt's September 2023 SEC filings, which reveal the company was in financial trouble and had "'substantial doubt' about its ability to continue" operations. (*Id.*) In a later amendment to those filings, Bakkt further noted that it "did not believe" it would be able to continue operations as a company absent the influx of additional capital. (*Id.*) Mr. Saad alleges that Defendants deliberately delisted certain cryptocurrencies as part of a "calculated scheme" to obtain sufficient cash to continue operations. (*Id.*)

Soon thereafter, Saad, through counsel, sought to initiate arbitration under the terms of the Bakkt User Agreement. (*Id.*) That Agreement contains a term requiring the parties to submit any "controversy, demand, cause of action, whether in tort, contract, by statute or otherwise . . . to binding arbitration" before JAMS in Chicago, Illinois. (User Agreement [5-1] § 16.2 (typeface modified).) It includes detailed procedures on the number and selection of arbitrators, noting that the parties "are waiving their right to seek remedies in court, including the right to jury trial." (*Id.* §§ 16.1, 16.2.) It also notes that the arbitrator "shall apply the substantive law of the State of

---

[2] The complaint does not allege which of the Defendants specifically was responsible for creating and executing these market sale orders. (FAC [5] at 9–10.) The complaint also includes slightly different numbers for the purchase and sale allegations: it states that Plaintiff purchased 265,415.94 ADA, but 265,415.93 ADA was sold.

Delaware without giving effect to any conflict of laws principles that may apply." (*Id.* § 16.2.) On July 3, 2024, Saad served his arbitration demand on Defendants. Defendants evidently ignored this demand: they did not appear or participate in arbitration. (FAC [5] at 10.) Accordingly, on October 28, 2024, JAMS issued a "formal Notice of File Closure, terminating the arbitration due to Respondents' non-participation." (*Id.*)

This lawsuit followed. Saad brings several claims: (1) a breach of contract claim premised on alleged violations of Defendants' User Agreement; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) common-law conversion; (5) common-law negligence; (6) unjust enrichment; (7) common-law fraud; and (8) a commodities fraud claim pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* Defendants filed a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). (Mem. [31] at 1.) This motion is now fully briefed.

## DISCUSSION

### I. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of a complaint, not its merits. FED. R. CIV. P. 12(b)(6). Such a motion can be granted only if Saad has failed to allege "enough facts to state a claim to relief that is plausible on its face." *Bowlin v. Bd. of Directors, Judah Christian Sch.*, 167 F.4th 469, 474–75 (7th Cir. 2026) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this standard, the complaint must include sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wickstrom v. Air Line Pilots Ass'n, Int'l*, 156 F.4th 835, 841–42 (7th Cir. 2025) (quoting *Bronson v. Ann & Robert H. Lurie Child.'s Hosp. of Chi.*, 69 F.4th 437, 447 (7th Cir. 2023)). In assessing the sufficiency of the complaint, the court assumes the truth of the facts alleged and draws all reasonable inferences in the plaintiff's favor. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 878 (7th Cir. 2022).

## II. Analysis

### A. Contract Language

Defendants move to dismiss the FAC in its entirety. (Mem. [31] at 2.) Their primary argument in support of dismissal is that the language of Bakkt's User Agreement—specifically, the above-quoted provision that gives Defendants the right to "*delist* a cryptocurrency[] at any time"—expressly empowers Defendants to sell Saad's cryptocurrency holdings without his consent. (Mem. [31] at 5 (emphasis altered).)

The court does not agree that Defendants' interpretation supports dismissal of the complaint in this case. Under Delaware law, which both parties agree applies to the contract claim, "clear and unambiguous terms" within a contract must be given their "ordinary meaning." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012). If a contract's language is ambiguous, the court looks to extrinsic evidence to determine what an objectively reasonable third party would have understood the parties' intent to be. *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 834–36 (Del. Ch. 2007). The language in this contract does not appear to be ambiguous. It gives Defendants the right to "delist" a currency, and the definition of the word "delist," per Merriam-Webster, is "to remove (a security) from the list of securities that may be *dealt in* on a particular exchange."[3] The use of "delist" as opposed to a different word (such as "liquidate") suggests that the parties intended to give Defendants the discretion to remove any particular cryptocurrency from being available for purchase or sale, but not discretion to sell an accountholder's cryptocurrency holdings without his or her consent. It is difficult to imagine a reasonable user agreeing to such an arrangement, given that it would empower the platform to sell a user's investments, at any time, evidently without advance notice.[4]

---

[3] *See Delist*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/delist (last accessed August 20, 2026) (emphasis added).

[4] Defendants did provide Saad with notice in this case, but the contractual clause they cite as the source of their discretion does not include any notice requirement. To the extent Defendants suggest that Saad's failure to take action in the short time he was given requires

Given that cryptocurrencies can fluctuate dramatically in price, such discretion could be risky and very costly for the accountholder.

Moreover, Defendants' interpretation is inconsistent with the remainder of the contract. As Saad points out, Section 11.2 of the User Agreement states that the user is "solely responsible for any and all Orders placed through [the user's] account, and all Orders entered by [the user] are unsolicited and based on [the user's] own investment decisions." (User Agreement [5-1] § 11.2.) This language confirms that under the framework of the Agreement, the user would initiate all purchases and sales of cryptocurrency, and the platform would simply serve as a conduit, with no involvement in the user's purchase and sale decisions. That framework throws shade on Defendants' interpretation. *See GMG Capital Investments, LLC v. Athenian Venture Partners*, 36 A.3d 776, 779 (Del. 2012) ([A] court must construe the agreement as a whole, giving effect to all provisions therein."). Perhaps Defendants will present evidence showing that anyone familiar with the cryptocurrency industry would understand the right to "delist" as necessarily including the right to liquidate that currency, or that their prior notice to Mr. Saad forecloses his breach of contract claim. Dismissal on that basis would be inappropriate at this early stage, however. *Cf. Medal v. Beckett Collectibles, LLC*, No. 2023-0984-VLM, 2024 WL 3898535, at *11 (Del. Ch. Aug. 22, 2024) ("Dismissal is appropriate when the defendant's interpretation is the only reasonable construction as a matter of law and that construction reveals that the plaintiff cannot sustain an actionable claim").

Defendants' primary counterargument concerns the technical capability of their platform. They contend that, "from the perspective of Defendants' platform," "[d]elisting a cryptocurrency from the platform necessarily requires liquidating the asset back into U.S. currency." (Reply [42] at 1–2.) In other words, they argue that Webull is not capable of maintaining cryptocurrency assets on behalf of users after a currency is delisted. (*See id.* at 2.) As the court reads the

dismissal, the court notes that any affirmative defense based on acquiescence after notice is premature at the pleading stage. (Mem. [31] at 7.)

complaint, however, it does not appear that removing ADA and SOL from sale on Webull necessarily required Defendants to sell users' holdings of those coins. Presumably, Defendants could have offered Saad the opportunity to transfer his coins to a competing crypto wallet and held them on his behalf until he did so. (*E.g.*, Mem. [31] at 8 (suggesting that Saad could have "transfer[ed] the cryptocurrency to a different cryptocurrency service provider.").) Given that "delisting" without "liquidating" is technically possible, Defendants' argument appears to be that the *Webull app* has not added the capability for users to retain delisted coins. That is no defense. Defendants are bound by their contracts, even if they must make technical changes to their platform to abide by them, and they cannot force a sale simply because they do not wish to spend the resources to offer alternatives to their users.[5]

Moreover, even if Defendants can ultimately present evidence that something inherent in the cryptocurrency medium bars a platform from "delisting" coins without liquidating them, impossibility is an affirmative defense on which the Defendant bears the burden of proof. Dismissal on that basis would be inappropriate at the pleading stage. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019) ("Affirmative defenses do not justify dismissal under Rule 12(b)(6)." (citation omitted)).

The motion to dismiss Count I is denied.

**B. Remaining Arguments**

Defendants request dismissal of all counts of Saad's complaint, but have focused most of their arguments on the language of the contract. Those arguments do not satisfy the court that

[5] Defendants argue that "delisting" a crypto asset is "analogous to a broker like Charles Schwab announcing to its clients that it will close its doors." (Reply [42] at 2–3.) "Just as a shuttered broker cannot be expected to hold a client's shares after it closes, Defendants – which cannot trade in cryptocurrencies after they are delisted – cannot be expected to hold Plaintiff's cryptocurrencies." (*Id.*) This analogy is inapplicable for two reasons. First, Defendants did not close their doors: They continue to maintain an active platform, and thus cannot analogize to the circumstances facing a broker that is shutting down entirely. Second, even if Defendants "cannot *trade* in cryptocurrencies after they are delisted," that says nothing about Defendants *holding* delisted cryptocurrencies which, drawing all inferences in Mr. Saad's favor, they appear to be capable of doing.

dismissal is warranted, for the reasons already discussed. The court addresses Defendants' remaining arguments below.

### 1. Breach of the Covenant of Good Faith and Fair Dealing and Breach of Fiduciary Duty

Saad contends that Defendants' decision to force the sale of his cryptocurrency to (allegedly) increase their own revenue and liquidity constitutes a breach of the covenant of good faith and fair dealing, as well as a breach of fiduciary duty. (FAC [5] 12.) Defendants move to dismiss these claims, first, because Saad received notice and recovered proceeds from the sale. (Mem. [31] at 8, 9.) The court disagrees. True, Saad was provided with notice and was sent the proceeds of the sale, but he alleges here that Defendants sought to sell his cryptocurrency for self-serving reasons. (FAC [5] 2, 12.) The fact that Saad received notice of the sale, and received the proceeds, does not render his claims under these theories implausible.

Defendants' remaining arguments fare no better. They note that Mr. Saad only alleges that Defendants had a "financial incentive," which "does not rise to the level of establishing bad faith." (Mem. [31] at 7.) A financial incentive may not be sufficient to establish bad faith, but Saad also alleges that Defendants *did* take actions in their own best interest at his expense of Saad—specifically, selling Saad's holdings to increase their own short-term liquidity. (FAC [5] at 9–10.) While the exact factual contours of this claim are not clear at the pleading stage, the allegations are sufficient to support a plausible inference of self-dealing. Defendants also argued that they delisted the involved cryptocurrencies for unspecified regulatory reasons. (Mem. [31] at 7–8.) That argument, if supported by evidence, might be a defense at summary judgment or trial, but it is not a basis for dismissal at a stage where the court must take all facts in Saad's favor.[6]

[6] Defendants request dismissal of the "aiding and abetting breaches of fiduciary duty" claim because "there was no breach of any underlying fiduciary duty." (Mem. [31] at 12–13.) As explained here, Saad has plausibly alleged breach of fiduciary duty. Defendants' arguments are therefore inapplicable.

**2. Fraud, and Commodity Exchange Act**

Defendants also request dismissal of Saad's common-law fraud claim, as well as his claim under the Commodity Exchange Act ("CEA"),which sounds in fraud. (*See* Opp'n [39] at 12–13 (explaining that Defendants' conduct "constitutes a scheme to defraud"); *see also* FAC [5] at 12–19).)

As an initial matter, the court notes uncertainty as to which jurisdiction's law governs the common law claim. The contract states that the agreement "shall be governed by the internal laws of the State of Delaware," (User Agreement [5-1] § 17), but says nothing about tort or other common law claims that may arise outside of the contract. Likewise, while the arbitration agreement directs that the *arbitrator* "shall apply the substantive law of the state of Delaware," the agreement does not also say that Delaware law should apply in a court proceeding. (*Id.* § 16.2.) With respect to the non-contract claims, Defendants' briefing tends to cite Delaware cases, while Plaintiff cites mostly Illinois cases—neither party substantively comments on this. (*But see* Reply [42] at 10 (noting, in passing, that the parties cite different case law but making no argument as to which is proper).) The court suspects that Illinois law applies here for state law claims: In diversity, the court applies Illinois conflict of law rules, *see RCBA Nutraceuticals, LLC v. ProAmpac Holdings, Inc.*, 108 F.4th 997, 1000 (7th Cir. 2024), and Illinois applies its own law "unless an actual conflict with another state's law is shown, or the parties agree that forum law does not apply," *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020) (citations omitted).

In any event, at least with respect to common law fraud, it appears that Illinois and Delaware use a materially identical test. Under either jurisdiction, the plaintiff must ultimately prove that "(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *Blue Beach Bungalows DE, LLC*

*v. State*, 351 A.3d 1007, 1043 (Del. 2025); *see also Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (Illinois law) (using materially identical elements).

Applying that test here, Mr. Saad's common-law fraud claim must be dismissed. His theory of fraud is somewhat convoluted: He "alleges that Defendants engaged in a misrepresentation-based liquidation scheme . . . falsely representing that the liquidation of his ADA and SOL was authorized and unavoidable." (Opp'n [39] at 10.) In other words, his fraud claim appears to be premised on Defendants' alleged misrepresentations about the legal consequences of the contract. But a fraud claim typically involves misrepresentations of "fact," not misrepresentations about the legal consequences of a contract that Mr. Saad presumptively read. *See Blue Beach*, 351 A.3d at 1043; *Tricontinental*, 475 F.3d at 841. Nor did Mr. Saad rely on Defendants' alleged misrepresentation; he contends that it was Defendants' conduct in selling his cryptocurrency that injured him.

The only authority presented by Saad in support of his fraud theory, *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 841 (7th Cir. 2018), does not in fact support that theory. *Berkowitz* was a False Claims Act case concerning allegations that vendors sold products to the federal government from "non-designated countries" while signing a statement that the product came from a list of "designated countries." *Id.* *Berkowitz* contended that in signing these statements, defendants made a misleading statement of fact in violation of the False Claims Act; but the false statements in *Berkowitz* clearly concerned facts—and the Seventh Circuit affirmed the district court's *dismissal* of those fraud claims. The only portion of *Berkowitz* that even arguably supports Mr. Saad's position is the opinion's discussion of *Universal Health Servs., Inc. v. United States ex rel. Escobar*, where the Supreme Court held that a company can violate the False Claims Act by failing to "disclose noncompliance with material statutory, regulatory, or contractual requirements." 579 U.S. 176, 190 (2016). The import of a False Claims Act case in a common-law claim is unclear, but the court need not dive into the question because

Saad does not allege that Defendants falsely told him they were complying with the law. Instead, he merely alleges that Defendants told him they were taking action they were not authorized to take under the parties' contract. And it was that action (not Defendants' statements about it) that injured him.

The court notes, further, that Saad's allegations do not comply with FED. R. CIV. P. 9(b), under which plaintiff must plead the "who, what, when, where, and how of the fraud—the first paragraph of any newspaper story." *Berkowitz*, 896 F.3d at 839. Saad has alleged that Defendants believed (perhaps erroneously) that they possessed a contractual right to sell Mr. Saad's cryptocurrency without his consent, and that they notified him that they intended to exercise that right. This does not support a plausible inference that Defendants intended to induce any act or omission, or that Mr. Saad did act in justifiable reliance on the representation, both of which are typically elements of common law fraud. *See Blue Beach*, 351 A.3d at 1043; *Tricontinental*, 475 F.3d at 841. As the Seventh Circuit has explained, a plaintiff alleging fraud must "use some . . . means of injecting precision and some measure of substantiation into their allegations of fraud." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). Saad's allegations do not meet that bar.

The court turns to the CEA claim. Saad asserts that his claim arises under Section 6(c)(1) of the Act, codified at 7 U.S.C. § 9(1), and 17 C.F.R. § 180.1(a),[7] the relevant implementing regulation. (Opp'n [39] at 12.) To prove a violation of these provisions, Saad must ultimately show "that Defendants engaged in prohibited conduct (i.e., employed a fraudulent scheme; made a material misrepresentation, misleading statement or deceptive omission; or engaged in a business practice that operated as a fraud); with scienter; and in connection with a contract of sale of a commodity in interstate commerce." *Commodity Futures Trading Comm'n v. McDonnell*,

[7] It is not clear that Plaintiff can privately enforce the requirements of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a). Under 7 U.S.C. § 25, a private cause of action is only available in limited circumstances, and it is not clear that Saad meets those requirements. Because Defendants do not raise this argument, the court need not address it.

332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018); *see also CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) (Blakey, J.) (recognizing that the "level of scienter required to plead a cause of action for manipulation is 'intentionally or recklessly'" (quoting 17 C.F.R. § 180.1(a))). The same flaws doom this claim: It is not pleaded with the particularity required by Rule 9(b), and there is no basis for believing that a contract breach constitutes commodities fraud, or that Defendants made any misrepresentation with the scienter required by the CEA. Without more, this claim must be dismissed.

The common law fraud and commodities fraud claims are dismissed. Saad has leave to file, within 14 days, an Amended Complaint that includes additional detail plausibly alleging the predicates of common-law fraud and/or a violation of the Commodity Exchange Act.

**3. Unjust Enrichment**

Defendants move to dismiss Saad's unjust enrichment claim. (Mem. [31] at 10–11.) Mr. Saad does not meaningfully respond and has thus forfeited any objection. The unjust enrichment claim is dismissed.

**4. Conversion and Negligence**

Defendants also move to dismiss the conversion and negligence claims. (Mem. [31] at 9–10.) The court notes again that the parties have not agreed on which state law applies here; they instead cite cases from different jurisdictions with little mention of the other side's position. Plaintiff does not appear to acknowledge the difference at all, and Defendants assert, without elaboration, that it is "undisputed that the parties' conduct is governed by Delaware law." (Reply [42] at 10.) It is clearly not undisputed, given that Plaintiff cites Illinois cases. The court cannot reach the merits of Defendants' arguments here without certainty on which law applies, as Delaware and Illinois appear to treat the issues differently. *Compare Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009) ("Conversion is any distinct act of dominion wrongfully exerted over the property of another, in denial of the plaintiff's right, or inconsistent with it." (cleaned up)); *with Kennedy v. Intraspectrum Counseling, Ltd.*, 699 F. Supp. 3d 667, 670 (N.D. Ill. 2023) (stating that

Illinois requires, *inter alia*, a "right to the immediate possession of the property," and "a demand for possession"). (*See also* Reply [42] at 10 (noting that Delaware and Illinois have different approaches to the economic-loss doctrine).) The motion to dismiss the conversion and negligence claims is denied without prejudice to renewal.

**5. Declaratory and Injunctive Relief**

Defendants also argue that Saad cannot request declaratory or injunctive relief in this case because "Plaintiff is only seeking to redress the past conduct, and has no standing to address any future conduct." (Mem. [31] at 11.) As Saad notes, however, his allegations support an inference that he is an ongoing accountholder with Defendants and that Defendants "maintain an ongoing custodial relationship" of his cryptocurrency assets. (Opp'n [39] at 9.) He contends, therefore, that he suffers "a continuing risk of unauthorized liquidation that monetary damages cannot prevent." (*Id.*) This risk of ongoing harm is enough to support Article III standing for purposes of declaratory and injunctive relief. *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 289 (7th Cir. 2016) (observing that, at the pleading stage, it suffices to "plead sufficient factual allegations, taken as true, that 'plausibly suggest'" the elements of standing (quoting *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015))). If it becomes clear that Mr. Saad is no longer an accountholder with Defendants, or that any request for forward-looking relief has become moot, Defendants may renew their standing objection at that time. *See* FED. R. CIV. P. 12(h)(3).

## CONCLUSION

Defendants' motion to dismiss [30] is granted in part and denied in part. Defendants are directed to answer Plaintiff's complaint within 21 days of this order, or 21 days after the filing of an amended complaint, if one is timely filed. The court notes that Saad's damages are uncertain, as the current value of the cryptocurrency varies over time, and encourages the parties to consider settlement.

ENTER:

Dated: September 2, 2026

REBECCA R. PALLMEYER
United States District Judge